Gary RAWLINGS, Jr., Appellant,

v.

STATE of Missouri, Respondent.

No. WD 56300.

Missouri Court of Appeals,
Western District.

Nov. 2, 1999.

Mary Frances Weir, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Greg A. Perry, Asst. Atty. Gen., Jefferson City, for respondent.

Before Judge VICTOR C. HOWARD, Presiding, Senior Judge FOREST W. HANNA[1] and Judge LAURA DENVIR STITH.

1. Judge Forest W. Hanna took senior status between the date this case was submitted and the date of this opinion.

LAURA DENVIR STITH, Judge.

Gary Rawlings, Jr., appeals the judgment of the trial court denying his application for a ninth conditional release from the custody of the Missouri Department of Mental Health. On appeal, Mr. Rawlings asserts the trial court violated his due process rights in denying him a conditional release without first finding that he continues to suffer from a mental disease or defect which renders him dangerous to others. He further argues that, even were specific findings on these issues not required, he proved by clear and convincing evidence that he was not likely to be dangerous while on conditional release. Because we find that the record is inadequate to permit us to determine whether the trial court believed Mr. Rawlings to be dangerous to others, or, if so, whether the court so found solely based on the fact that Mr. Rawlings was taking medication, or based on an incorrect assumption that Mr. Rawlings had to prove his proposed residence at the Peery Apartments was a "secure facility," we remand for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On October 5, 1988, Mr. Rawlings pleaded not guilty by reason of mental disease or defect pursuant to Section 552.030.1 RSMo 1978, to the charges of second-degree murder and armed criminal action. He was committed to the Missouri Department of Mental Health (DMH) on October 5, 1988. In 1990, Mr. Rawlings was granted his first conditional release from commitment at the DMH, and he continued on six subsequent conditional releases without violation. As part of his conditional releases, Mr. Rawlings was to take his daily medication in person at the Peery Apartments Group Home.[2]

On May 2, 1997, while on his eighth conditional release, Mr. Rawlings filed an application for his ninth conditional release. Prior to the hearing on the merits of the application, Mr. Rawlings' eighth conditional release was revoked by the DMH on July 2, 1997, for Mr. Rawlings' failure to take his medication on June 4, 1997, and he was readmitted to Saint Joseph Mental Hospital. Mr. Rawlings amended his earlier application for his ninth conditional release on September 19, 1997. A hearing on the amended application was held on November 25 and 26, 1997.

At the hearing, Mr. Rawlings testified that he thoroughly understood that it was a condition of his release to appear at the Peery Apartments each day to take his medication, but explained the reason for his failure to appear on June 4, 1997. He explained to the court that he had a regular schedule pursuant to which he would stop by the Peery Apartments each day after getting off of work, take his medication, and then proceed to his father's home, where he was living. He explained that on June 4, 1997, he became distracted from his regular routine because his social worker interrupted him at work for a random drug screening. Since he left work early for the drug screening, he decided to return home before stopping by the Peery Apartments for his medication.

While at home, his father informed him that the news media was calling about his hearing to be held the next day on his application for his ninth conditional release. He stated that he became concerned about the effect of the news media's attention on his hearing and worried about finding the courthouse and arriving at the hearing promptly, as he had never been to the courthouse or courtroom where his hearing was scheduled. He decided to drive to the courthouse to make sure he was going to the proper location and to find a place where he could park the next day. He then went home,

---

2. Mr. Rawlings lived at the Peery Apartments for several years as part of his aftercare plan in prior conditional releases. In December 1996 Mr. Rawlings was conditionally released to reside with his father in his father's home.

watched the news on television, and went to bed. It was not until he awoke the next morning and he received a telephone call from Doug Shapiro, his forensic case monitor, asking him why he did not take his medication the previous day, that he realized he had forgotten to go by the Peery Apartments to take his medication. Although he left that morning to go to the Peery Apartments to take his medications, as a result of his failure to take his medication, Mr. Shapiro came by his home to take him to the DMH. His conditional release was revoked and he was readmitted to the mental hospital.

Mr. Rawlings further testified that he understood it was important that he take his medication every day in order to keep his illness in remission. He testified that he understood his conditional release would require him to take his daily medication in person at the Peery Apartments, and that he would do his best to take the medication every day. In addition, he stated that in order to avoid any situation in which he might become distracted and forget to take his medication, he would take his medication in the morning instead of the evening. This would allow for more time so that in the unlikely event he did not arrive at the Peery Apartments within so many hours, someone could contact him and allow him to come by later in the day to take his medication.

Dr. Zeja Suhikant, a psychiatrist at Northwest Missouri Psychiatric Rehabilitation Center, testified that he began treating Mr. Rawlings for a few months in 1991, and then became his psychiatrist again after the revocation of his eighth conditional release in June 1997. Dr. Suhikant testified that Mr. Rawlings' diagnoses are schizophrenia, chronic paranoid type, in remission since 1988, alcohol abuse in remission, and cannabis abuse in remission. Dr. Suhikant opined that Thiothizene, an antipsychotic medication taken by Mr. Rawlings, fully controls Mr. Rawlings' psychotic symptoms.

Dr. Suhikant characterized Mr. Rawlings' performance in taking his medication throughout the period of his conditional releases as exemplary, noting he had been fully compliant over the many years he had been on conditional release, other than on the one day he forgot his medication, June 4, 1997. The doctor further noted that Mr. Rawlings' failure to take his medication on that one particular day did not cause the doctor to have any concerns about Mr. Rawlings' stability or reliability or his dangerousness if granted a conditional release. Dr. Suhikant stated it was his opinion that, if Mr. Rawlings were granted a conditional release, he would not be dangerous to himself or to the public safety, given Mr. Rawlings' remorse for his criminal conduct, his understanding about his mental illness, and his years of compliance with his medication.

Dr. Donald Simmons, staff psychiatrist at the DMH, also testified in favor of granting Mr. Rawlings' ninth conditional release. Dr. Simmons testified that he began to see Mr. Rawlings as a patient in 1992 and that he had seen him on a monthly basis since January 1996. Dr. Simmons stated that he reviewed Mr. Rawlings' entire history, had observed his mental condition, and had consulted with other employees at the DMH, in order to form his opinion on the conditional release. It was Dr. Simmons' opinion that there was no clinical indication that Mr. Rawlings needed to be hospitalized, and that the proposed release plan would provide Mr. Rawlings with all the structure necessary to ensure his success in continuing his treatment. Dr. Simmons further opined that Mr. Rawlings was not likely to be dangerous if he were granted the ninth conditional release.

In opposition to Mr. Rawlings' ninth conditional release, the State called Mr. Rawlings' father, Gary Rawlings, Sr. In calling Mr. Rawlings' father as an adverse witness, the State attempted to cast doubt on the suitability of his father as Mr. Rawlings' custodian on conditional release.

The State solicited testimony that Mr. Rawlings Sr. believed the driving and supervised visitation restrictions in his son's prior conditional releases were a hardship and uncalled for, that the father had recently undergone a quadruple by-pass, that the father may have participated in an allegedly inappropriate note Mr. Rawlings mailed to a former case worker, and that the father may have failed to report to the DMH a possible violation of Mr. Rawlings' release, in that a social worker left during a portion of the visit Mr. Rawlings had with his children on Thanksgiving, although other family were present. The State further showed Mr. Rawlings' father had a medical history which included periods of depression, and that Mr. Rawlings' sister is a recovering drug addict who has been "clean" for 11 years.

The State also called Doug Shapiro, Mr. Rawlings' forensic case monitor. Mr. Shapiro testified that Mr. Rawlings had cried in his office on two separate occasions concerning certain stresses in his life, including living with his father, who had just undergone surgery, as well as working overtime hours and being able to maintain a relationship with his girlfriend. Mr. Shapiro nonetheless testified that Mr. Rawlings was one of his best clients, and that he had never had any problems with Mr. Rawlings, and that Mr. Rawlings' father's home was a healthy environment for Mr. Rawlings. Mr. Shapiro concluded that he, as well as the forensic review committee, recommended that the ninth conditional release be granted. The State called no other witnesses and produced no testimony that Mr. Rawlings was now dangerous or was likely to be so in the future.[3]

Following the hearing, Mr. Rawlings filed an amended aftercare plan on December 5, 1997, changing his proposed placement with his father to placement at the Peery Apartments or a comparable residential care facility, group home, or boarding home. On March 6, 1998, the court convened for another hearing in order to acquire more evidence about the Peery Apartments.

Jean Perry, the director of the Peery Apartments, testified that she had supervised Mr. Rawlings at the Peery Apartments for over four years during prior conditional releases. She testified that the Peery Apartments are an on-premises supervised residential care facility designed to assist and prepare patients for independent living in the community. She stated there is 24-hour staffing, and that there are never less than two staff members and one security officer present at the facility. The residents follow a sign in/sign out procedure, and the residents are free to leave on their own during the day to go to work or to appointments. There are curfews imposed at night, as well as bed checks throughout the evening and early morning hours. If someone is late for curfew, the Kansas City Police Department is notified within five to ten minutes, as is the forensic case monitor. Ms. Perry stated that she never experienced any problems with Mr. Rawlings while he stayed at the apartments during prior releases, and that he was one of few residents who actually obeyed all the rules and maintained steady, full-time employment.

Despite the evidence of the structured environment at the Peery Apartments, and the reports of Mr. Rawlings' past successes in residing at the Peery Apartments, the State argued that the Peery Apartments were not adequate because they were not a "secure environment." In closing arguments, the State asserted:

> It is the position of the Jackson County Prosecutor's Office that Mr. Rawlings *should be held in a secured environment since the law has changed.* The law as it existed when Mr. Rawlings was first placed in the DMH was to provide the least restrictive environment. That law has since changed. It now states

**3.** Testimony was heard from Mr. Smith, the father of the second-degree murder victim, who made a victim impact statement to the court.

that if a person is committed to the DMH pursuant to Chapter 552 because of not [guilty] by reason of insanity for a dangerous felony or an attempt to commit one of the—one of those dangerous felonies, *the placement shall be to a security* [sic] *facility unless a court orders allowing placement in a nonfacility.* So we've gone to the least most [sic] restrictive means unless there's a specific court order. And here, Your Honor, we've had the violation of a significant condition of this person's release, which was the taking of medication and that was a violation of his conditional release that did occur while—while Mr. Rawlings was housed with his father in apparently the least restrictive means. *And we're arguing that he should be held again in a secured facility because of the change in the law* and because this has been such a heinous crime that was committed, that a secured facility is justified in this case especially where somebody has failed to take their medication for whatever reason.

(emphasis added)

On March 17, 1998, the trial court entered an order denying Mr. Rawlings' application for conditional release. The court below did not make an express finding as to whether Mr. Rawlings was suffering from a mental disease or defect at that time, nor did it make an express finding that Mr. Rawlings was likely to be dangerous to others. Rather, it found:

> That [Mr. Rawlings] is aware of the nature of his crime and that he possesses the capacity to appreciate the criminality of the act and may be able to conform his conduct to the requirements of the law.

> However, the court is not persuaded that the proposed residential care facility is a secure facility pursuant to § 630.615(5) and § 630.620.2 of RSMo (1996); and [Mr. Rawlings] should be in a secure facility at this time.

Thus, the court denied the ninth conditional release because the Peery Apartments are not a secure facility. It did not address the fact that Mr. Rawlings agreed to be released to any comparable residential care facility. Mr. Rawlings appeals.

## II. STANDARD OF REVIEW

■ Our review of the denial of an application for conditional release from the custody of the DMH is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). *State v. Dudley*, 903 S.W.2d 581, 584 (Mo.App.1995). We will reverse the trial court's decision only if there is no substantial evidence to support it, unless it erroneously declares or applies the law, or unless it is against the weight of the evidence. *Id.*

## III. ANALYSIS OF BASIS OF DENIAL OF CONDITIONAL RELEASE

Mr. Rawlings claims the trial court erred in denying his application for conditional release because, in denying his application, due process required the court to make an express finding that Mr. Rawlings suffers from a mental disease or defect which renders him dangerous to others.

The trial court's authority to grant a conditional release to a petitioner found not guilty by reason of mental disease or defect is governed by Section 552.040. Section 552.040 provides six non-exclusive factors the court shall consider in determining whether a person should be conditionally released:

(1) The nature of the offense for which the committed person was committed;

(2) The person's behavior while confined in a mental health facility;

(3) The elapsed time between the hearing and the last reported unlawful or dangerous act;

(4) The nature of the person's proposed release plan;

(5) The presence or absence in the community of family or others willing to

take responsibility to help the defendant adhere to the conditions of the release; and

(6) Whether the person has had previous conditional releases without incident.

Sec. 552.040.12 RSMo Cum.Supp.1996.

 Although Section 552.040 does not expressly state that the court must make a specific finding that the applicant still suffers from a mental disease or defect in denying a conditional release, the United States Supreme Court has held that such a finding is necessary to satisfy due process requirements of the United States Constitution. *See Foucha v. Louisiana*, 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). In *Foucha*, the Supreme Court held that due process forbids the continued confinement of an individual acquitted by reason of insanity after the individual no longer suffers from a mental disease or defect. In *Styles v. State*, 838 S.W.2d 10, 11 (Mo.App.1992), this Court held that, "[u]nder *Foucha*, it is necessary for a court to make a finding that an insanity acquittee is suffering from a mental disease or defect before it can order that such person shall remain in a mental institution." Thus, to deny an application for conditional release, the trial court must find that the person still suffers from a mental disease or defect which renders him dangerous to others because it is a denial of due process to restrain a harmless, mentally ill person. *State v. Nash*, 972 S.W.2d 479 (Mo.App.1998); *Viers v. State*, 956 S.W.2d 465 (Mo.App.1997); *Stallworth v. State*, 895 S.W.2d 656 (Mo. App.1995).

 Here, it is undisputed that the trial court did not make an express written finding that Mr. Rawlings continued to suffer from a mental disease or defect rendering him dangerous to others. The State contends, however, that even under *Foucha* the court below was not required to expressly make a finding of continued disease or defect and dangerousness if such a finding could be implied. In sup-

port, it notes that, once Mr. Rawlings was found not guilty by reason of mental disease or defect rendering him dangerous to others, the relevant statutes create a presumption of continuing mental disease and defect, and place the burden on Mr. Rawlings to prove by clear and convincing evidence that he no longer suffers from such a mental disease or that he is no longer dangerous. *See* Section 552.040.12 RSMo Cum.Supp.1996. It argues that, in light of this presumption, we can infer from the trial court's silence on the issue and its denial of Mr. Rawlings' application for conditional release that it found Mr. Rawlings had failed to meet his burden of proof.

We need not resolve this issue, which is now pending in our Supreme Court on transfer of this Court's decision in *State v. Revels*, WD 55481, 1999 WL 374113 (Mo. App.W.D. Apr. 13, 1999). We find that, even if the Supreme Court were to agree with the State's position on this issue, remand is required because we cannot imply from the trial court's silence in this case that it found that Mr. Rawlings would be likely to be a danger to others, for the court was not silent on this issue. To the contrary, as quoted above, the court below found:

> That [Mr. Rawlings] is aware of the nature of his crime and that he possesses the capacity to appreciate the criminality of the act and may be able to conform his conduct to the requirements of the law.

> However, the court is not persuaded that the proposed residential care facility is a secure facility pursuant to § 630.615(5) and § 630.620.2 of RSMo (1996); and [Mr. Rawlings] should be in a secure facility at this time.

The court thus found that Mr. Rawlings was able to appreciate the criminality of his act and that he may be able to conform his conduct to the law, but denied release because the court found that he needed to be in a secure facility. The court does not say why Mr. Rawlings needed a secure

facility, but from these findings it is evident it is not because the trial court found that Mr. Rawlings would be unable to conform his conduct to the requirements of the law if released, or that he did not appreciate the criminality of his prior conduct.[4]

We thus look to the record to see if it provides any evidentiary basis for concluding that Mr. Rawlings needed to be in a secure environment to conform himself to the requirements of the law. No witness so stated, or suggested that Mr. Rawlings could not conform himself to the requirements of the law except in a "secure" environment. The only fact any person identified which weighed against his conditional release was the fact that on a single occasion Mr. Rawlings had failed to take his medication. However, such a single failure cannot in and of itself provide a perpetual basis for denial of even a conditional release, as the State appears to argue. It is simply one factor to consider in deciding the dispositive issue whether he will be likely to take his medication while on conditional release and whether Mr. Rawlings is now or is likely in the near future to be dangerous to others. The only evidence was that no danger arose from Mr. Rawlings' single failure to take his medication, and that the need for supervision of his taking of medication was taken into consideration in requesting his placement to the Peery Apartments or a similar residential facility rather than his father's home, and in moving the time for taking his medication to the morning.

■ The record does reveal, however, that the prosecutor argued to the court below that a change in the law now required Mr. Rawlings to establish that his proposed residence be a "secure facility,"

should he be released, citing Section 552.040. This is incorrect. Although Section 552.040 has changed the standard for the level of security of the initial placement in residential facilities for those individuals who are acquitted of dangerous crimes and committed to care, this new standard does not apply to the proposed residence of such acquittees should they later meet the requirements for conditional release.

To the contrary, Section 552.040.4 provides that "[a]ny person committed pursuant to subsection 2 of this section shall be kept in a secure facility *until such time as a court of competent jurisdiction enters an order granting a conditional or unconditional release to a nonsecure facility."* Sec. 552.040.4 RSMo Cum.Supp.1996 (emphasis added). In other words, the statute requires a secure facility only until such time as the person is given a conditional release. It does not require a conditional release be served in a secure facility; indeed, such a requirement would often be inconsistent with the purposes of conditional releases: to live in a supervised, but more independent, setting on a conditional basis. The confusion about a secure setting may also have been influenced by the State's introduction of evidence that another resident of the Peery Apartments had once signed out and left the country. There was no evidence to show why misbehavior by another individual wholly unrelated to Mr. Rawlings should affect his right to release, however, particularly in light of the evidence that he had successfully completed numerous earlier conditional releases at that very location and had always followed the rules while living there.[5]

4. In *McKee v. State*, 923 S.W.2d 525 (Mo.App. 1996), a finding that an individual was *unable* to conform his conduct with the law was determined to essentially be a finding that the individual was also dangerous. Here, however, the court found that Mr. Rawlings *may* be able to conform his conduct with the law.

5. It would, of course, not be proper to deny Mr. Rawlings' release because it was timed shortly after negative publicity about this other individual. We note there was no evidence in the record that Peery Apartments failed to follow proper procedures in the other case, but if the court's concern was for some reason that the Peery Apartments in particular

As a result of the brevity and ambiguity of the court's ruling, and in light of this record, we are left to speculate whether the court based its decision on the incorrect assumption that Section 552.040 required Mr. Rawlings to reside in a secure facility on conditional release. Moreover, if not, the only other basis for denial evident in the record was Mr. Rawlings' continued need for medication in order to control his mental disease and his failure to take his medications on June 4, 1997. If the court based its decision on the former ground, then it committed reversible error, for a denial of an application for conditional release is not required simply because the person seeking release must continue to take medications to avoid being dangerous. *See Jensen v. State,* 926 S.W.2d 925 (Mo.App.1996); *State v. Dudley,* 903 S.W.2d 581 (Mo.App.1995). On the other hand, if the court believed that Mr. Rawlings would be unlikely to take his medications in the future, or for other proper reasons felt he would be dangerous to others despite the court's finding he could conform his conduct to the requirements of the law, then its ruling would be within its discretion if supported by the evidence. However, in light of the fact that Mr. Rawlings had only once, in a special situation, failed to take his medication, and that no expert or other witness testified he would be likely to do so again, we are unclear as to the facts on which the court below could have based such a belief.

For these reasons, in the absence of a more detailed explanation from the trial court as to the basis of its decision to deny Mr. Rawlings' application, and in light of the likelihood that the judge may have been misled by the prosecutor's argument into applying the wrong legal standard, we cannot conduct a meaningful review of Mr. Rawlings' claims that the court's decision was against the weight of the evidence. We therefore remand to the trial court for reconsideration of this issue. Because of

the passage of time since the prior hearing, it would be appropriate for the court to further take additional evidence concerning Mr. Rawlings' mental condition since the prior hearing before determining Mr. Rawlings' eligibility for a conditional release in a manner consistent with this Court's opinion.

Presiding Judge VICTOR C. HOWARD and Judge FOREST W. HANNA concur.

were not an appropriate facility, Mr. Rawlings made clear he was requesting release to

Peery Apartments *or any comparable facility,* not just to Peery Apartments.